Patricia M. **RASTER**, et al.,
Plaintiffs/Appellants,

v.

**AMERISTAR CASINOS, INC.**, et al., Defendants/Respondents.

Nos. **ED 90984, ED 91098.**

Missouri Court of Appeals,
Eastern District,
Division Two.

Feb. 17, 2009.

Motion for Rehearing and/or Transfer to Supreme Court Denied April 6, 2009.

Application for Transfer Denied
May 5, 2009.

Arthur G. Muegler, Jr., St. Louis, Louis J. Basso, Chesterfield, MO, for appellants.

David T. Hamilton, St. Charles, MO, for respondents.

LAWRENCE E. MOONEY, Judge.

The plaintiffs appeal the judgment of the trial court dismissing their two claims brought under the Missouri Merchandising Practices Act (MMPA) and their two breach-of-contract claims against the defendants Ameristar Casinos, Inc. and Ameristar Casino St. Charles Inc. The plaintiffs also appeal the trial court's ruling disqualifying the legal counsel for the plaintiffs. We reverse and remand.

### Factual and Procedural Background

This dispute stems from the defendants' Star Award program. The plaintiffs are certain video-poker-machine players at the defendants' Ameristar Casino, located in St. Charles County, Missouri. As noted by the parties, to legally engage in casino gambling in Missouri, one must first obtain a "casino admission card" from the casino operator. The player must then exhibit this card to gain entrance onto the casino gambling floor. In Missouri, legalized casino gambling is not conducted with money or other negotiable currency. Section 313.817 RSMo 2000.[1] Rather, a player exchanges his cash for tokens or chips. Id. Once on the gambling floor, the player inserts his card into a gambling device, and then inserts his tokens or chips into the device. At the Ameristar Casino, a player desiring to enter the gambling floor must first register for Ameristar's Star Awards player's club program. Upon registration, the player receives a personal Star Awards membership card, which the player then presents to gain access to the casino floor.

Ameristar's Star Award program is a compensation program. A member inserts his membership card into slot or video-poker machines and receives points based on the volume of his play. The member may then redeem his earned points for cash back and other complimentary benefits. In addition to the points-based complimentary program, Ameristar also has a "food-comp" program, whereby the casino provides complimentary food coupons to certain members, upon request, if certain prerequisites are satisfied. There are four tiers of Star Awards membership—Red, Premier, Elite, and Star Club. The level of one's membership is based upon the number of points earned through the member's historic gambling activities at the casino during a six-month or twelve-month period of time. Each level of membership carries with it an increasing number of benefits, with the Star Club being the highest membership level.

The defendants changed their point and food-comp programs in 2006. These changes, and the alleged actions of the defendants associated with these changes, underlie the plaintiffs' complaints in their four-count petition, which consists of a MMPA and a breach-of-contract claim related to the point-based program, and a MMPA and a breach-of-contract claim related to the defendants' food-comp program.

As to the point-based program, the defendants acknowledge in their motion to dismiss that they restructured their point-award formulas for slot and video-poker machine play, effective August 2006. The plaintiffs note three particular changes. First, they note the defendants changed the number of points required to accrue

---

1. All statutory references are to RSMo 2000.

cash back and other complimentary benefits. In particular, they allege the defendants moved the number of earned points from 125 points to 600 points for the accrual of $1.00 of earned cash back and other complimentary benefits. Secondly, the plaintiffs state the defendants changed the number of points needed to qualify for Star Club card status, from 20,000 to 40,000 points. And lastly, the plaintiffs charge the defendants secretly increased the number of flow-through dollars in video-poker machines necessary to earn one point for cash and food comps and card status determinations. In conjunction with these changes to the point-award formulas, the plaintiffs assert the defendants made the following representation:

Nothing really has changed ... Ameristar has changed the way it determines play points BUT after August 1, 2006 you will get four (4) times the number of points you would have gotten for the same dollar play as you had prior to August 1, 2006 ... therefore, if you play the same number of dollars you played to qualify for Star Club status prior to August 1, 2006, then you will also qualify for Star Club status after January 31, 2007 (when the current Star Club card expires) and you will also get the same cash-back comp as before the point change.

The plaintiffs maintain the defendants made this representation when they knew it would take at least two to four times the number of flow-through video-poker machine dollars to earn one point when compared to the video-poker point-earning system in existence prior to August 1, 2006.

The plaintiffs brought suit, contending that the defendants' actions violated the MMPA and constituted a breach of contract. For their MMPA claim, the plaintiffs alleged that the defendants' representation regarding the changes in the point-award formulas, and the defendants' failure to timely and adequately disclose its falsity, was an "unlawful practice" within the meaning and scope of the MMPA. The plaintiffs further alleged that they purchased the defendants' gambling entertainment service by inserting "cash" (in the form of tokens) into the casino's video-poker machines, and that they suffered an ascertainable loss of money and property—namely the dollar value of "lost" cash-back comps and Star Awards club card status, and the benefits associated therewith—as a result of the defendants' unlawful acts and practices. For their breach-of-contract claim, the plaintiffs alleged that they accepted the defendants' cash-back, food-comp, and point-determination offer by gambling at the casino. They further alleged the defendants breached the contract, causing the plaintiffs to suffer damages in the form of the value of "lost" cash-back comp awards and lost Star Awards club card status.

As to the food-comp program, the plaintiffs state that the defendants changed this program in March of 2006. Prior to this time, according to the plaintiffs, the casino determined food comps based on the number of points earned by a member through the member's gambling play during his last five visits to the casino—the "last-five-visit rule." The casino required members to redeem their food-comp awards via food purchases at the casino restaurant within a stated period of time—usually seven days. If a member did not redeem the food comps, the comps lapsed and became void. The plaintiffs maintain that in March of 2006, the defendants represented that they had a new food-comp program, under which the casino would "bank" and accumulate food-comp awards. The plaintiffs assert that the defendants thereby discouraged them from redeeming the full dollar value of earned food comps by rep-

resenting to them that "we now have a food comp bank program ... you will not lose your earned food comps if you don't take all your earned food comp now because we no longer have the 'last five visit' rule ... just take what you need today and save the rest." According to the plaintiffs, the defendants terminated their new system and reinstituted their old food-comp program in June of 2006.

Plaintiffs brought suit, contending that the Casino's actions violated the MMPA and constituted a breach of contract. For their MMPA claim, the plaintiffs alleged that the defendants' new food-comp program, their representations related to that program, and their failure to fairly disclose the falsity of the representations, constituted an "unlawful practice" by the defendants within the meaning and scope of the MMPA. The plaintiffs further alleged that they purchased the defendants' gambling entertainment service by inserting money into video-poker and reel slot machines. And by electing to bank food comps, they allege they suffered an ascertainable loss of money and property—namely the dollar value of the lost "banked" food comps—as a result of the defendants' unlawful practices. For their breach-of-contract claim, the plaintiffs averred that they accepted the defendants' new food-comp offer by gambling at the casino and "banking" food comps rather than redeeming all earned food comps. The plaintiffs maintained that the defendants breached the contract, causing the plaintiffs to suffer damages in the form of the value of "lost" food-comp awards.

The defendants filed a motion to dismiss the plaintiffs' petition for failure to state a claim upon which relief could be granted, setting forth multiple grounds for dismissal. As to the plaintiffs' MMPA claims, the defendants asserted that the plaintiffs had failed to state a claim, and therefore the counts should be dismissed, because the plaintiffs did not "purchase" or "lease" any "merchandise," nor suffer an "ascertainable loss," all essential elements of a claim under the MMPA. The defendants additionally argued that there could be no actionable false representation or promise because they had expressly reserved their right to terminate or make changes to the program at any time. As to the plaintiffs' breach-of-contract claims, the defendants contended that the plaintiffs had failed to state a claim, and therefore the counts should be dismissed, because there was no contract between the plaintiffs and defendants. And further, even if there was a contract, the defendants asserted that the counts should nevertheless be dismissed because the plaintiffs had not alleged facts establishing a breach on the part of the Casino, and because the plaintiffs had not suffered any damages. In addition to these above-stated grounds, the defendants also contended that plaintiffs' petition should be dismissed because the Missouri Gaming Commission had primary jurisdiction over the matter.

In their memoranda in support of their motion to dismiss, the defendants included a copy of a purported Star Awards card that was in use before September 2006. The defendants also set out the following language, allegedly printed on the back of every card:

> Use of this card indicates acceptance of the terms and conditions of the Star Awards program. Ameristar reserves the right to change or alter the terms and conditions of any aspect of this program. This card and any benefits earned are non-transferable and may be cancelled by Ameristar Casinos, Inc. or its subsidiaries at any time.

A copy of the card, and the language contained thereon, is conspicuously absent

from the plaintiffs' petition. The defendants' defense relies heavily on this language. However, the defendants, for reasons that elude us, neither filed an answer nor a motion for summary judgment. As we shall further discuss, the trial court considered the terms imprinted on the Star Award card; its actions in so doing are now assigned as error on appeal.

The trial court granted the Casino's motion and dismissed all counts of the plaintiffs' petition. The court dismissed the plaintiffs' MMPA claims, finding that licensed gaming or gambling did not constitute a "sale" or "purchase" of "merchandise" or "advertisement of merchandise" as defined and used in the MMPA. The court dismissed the plaintiffs' breach-of-contract claims on a finding that their claims necessarily rested upon their status as card-holders. The court stated that it could consider the terms stated on the Star Awards card without converting the motion to dismiss into a motion for summary judgment. And in so considering those terms, the court dismissed the breach-of-contract claims, reasoning that "any terms of 'comps' are not contracts and are not binding upon the defendants, whether the representations are oral or written, because they are limited by the terms on the said cards."

In addition to filing a motion to dismiss, the defendants also filed a motion to disqualify the legal counsel for the plaintiffs. The Casino argued that counsel should be disqualified because (1) he had a disqualifying conflict of interest in his status as both a class member and as attorney of record; (2) he had a close personal relationship with the first-named and lead putative class representative; and (3) he was an essential fact witness on key issues in the case. The trial court granted this motion.

The plaintiffs now appeal, alleging error in each of the trial court's rulings. The plaintiffs first contend the trial court erred when it considered matters outside the pleadings—specifically the copy of the Star Awards card and the terms printed thereon—thereby treating the defendants' motion to dismiss as a motion for summary judgment without notice to the parties and opportunity to present all pertinent materials. Next, the plaintiffs argue the trial court erred in dismissing their MMPA and breach-of-contract claims. And finally, the plaintiffs claim the trial court erred in disqualifying their legal counsel. We shall address each contention in turn.

### Discussion

### Consideration of Terms Printed on Card

■ The plaintiffs first argue the trial court erred when it considered matters outside the pleadings and thereby treated the defendants' motion to dismiss as a motion for summary judgment without notice to the parties and an opportunity to present all pertinent materials. We agree. This Court's recent decision in *Platonov v. The Barn, L.P.*, 226 S.W.3d 238 (Mo.App. E.D.2007), is conclusive of this point. We borrow extensively from our analysis in that decision.

■ Rule 55.27 dictates that, "[i]f, on a motion ... to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment...." Rule 55.27(a). The parties also "shall be given reasonable opportunity to present all [pertinent] materials" for a summary judgment motion. Rule 55.27(a). In order to consider the matters outside the pleadings and treat the motion as one for summary judgment, the court must give notice to

the parties that it is going to do so. *Platonov*, 226 S.W.3d at 240.

Matters outside the pleadings were considered by the trial court. The terms printed on the Star Awards card, which were quoted in and attached to the defendants' motion to dismiss, were not part of the pleadings. The trial court relied upon these terms. Once matters outside the pleadings were presented to, and considered by the trial court, the court was required to treat the defendants' motion to dismiss as a motion for summary judgment. Rule 55.27(a); *Platonov*, 226 S.W.3d at 240. The court was also required to give notice to the parties that it was doing so and afford them an opportunity to prepare their respective motion and response accordingly. *Platonov*, 226 S.W.3d at 240. The trial court did not do so. The trial court erred in not expressly converting the motion to one for summary judgment and not notifying the parties that it was doing so. *Id.*

The defendants argue that because the plaintiffs' repeatedly referred to the card in their petition, the language from that card was necessarily embraced by the petition and not "outside the pleadings." The defendants are mistaken. "Any evidence beyond that found in the pleadings constitutes a matter outside the pleadings." *Id.* The defendants further contend that consideration of the language on the cards was appropriate based on Rule 55.22, which provides that when a "claim or defense is founded upon a written instrument, the same may be *pleaded* according to legal effect, or may be recited at length in the *pleading*, or a copy may be attached to the *pleading* as an exhibit." (Emphasis ours.) The defendants first maintain that the plaintiffs repeatedly referenced the card's legal effect, thus the court properly considered the card. We disagree; the plaintiffs never pleaded the card's legal effect. Next, the defendants contend that the court's consideration of the card was appropriate, as their defense is founded upon the language on the card, and they attached a copy of the card to its motion to dismiss. Again, the defendants are mistaken. What the defendants ignore is that they filed no pleading in the trial court. They filed only a motion to dismiss, which is not a pleading. *Platonov*, 226 S.W.3d at 240. It is, instead, an attack on the sufficiency of the plaintiffs' pleading. *Id.* The language printed on the card was not found in the only pleading before the court, the plaintiffs' petition, and was therefore outside the pleadings. *Id.* We grant the plaintiffs' point.

### Dismissal of Petition

The plaintiffs next allege that the trial court erred in dismissing their petition. We review the trial court's grant of a motion to dismiss *de novo*. *Lynch v. Lynch*, 260 S.W.3d 834, 836 (Mo. banc 2008). When reviewing the dismissal of a petition for failure to state a claim, we give the pleading its broadest intendment, treat all facts alleged as true, and construe the allegations favorably to the plaintiff "to determine whether the averments invoke substantive principles of law which entitle the plaintiff to relief." *Farm Bureau Town and Country Insurance. Co. of Missouri v. Angoff*, 909 S.W.2d 348, 351 (Mo. banc 1995). "A motion to dismiss for failure to state a claim is solely a test of the adequacy of the plaintiff's petition." *ORF Construction, Inc. v. Black Jack Fire Protection District*, 239 S.W.3d 685, 686 (Mo. App. E.D.2007); *see also, Platonov*, 226 S.W.3d at 240. "[W]e may not address the merits of the case or consider evidence outside the pleadings." *Weems v. Montgomery*, 126 S.W.3d 479 (Mo.App. W.D.2004)(internal citations omitted). "This Court reviews the petition to deter-

mine if the alleged facts meet the elements of a recognized cause of action and does not attempt to weigh whether or not the alleged facts are credible or persuasive." *ORF Construction*, 239 S.W.3d at 686. "If the petition asserts any set of facts that would, if proven, entitle the plaintiffs to relief, the petition states a claim." *Ste. Genevieve School District R–II v. Board of Aldermen of City of Ste. Genevieve*, 66 S.W.3d 6, 11 (Mo. banc 2002). Judged by these standards, we hold the trial court erred in dismissing the plaintiffs' petition.

### MMPA Claims

We first address the plaintiffs' allegation that the trial court erred in dismissing their two MMPA claims. The Missouri Merchandising Practices Act provides, in relevant part, as follows:

> Any person who purchases or leases merchandise primarily for personal, family or household purposes and thereby suffers an ascertainable loss of money or property, real or personal, as a result of the use or employment by another person of a method, act or practice declared unlawful by section 407.020, may bring a private civil action ... to recover actual damages....

Section 407.025.1. Several of the terms in this section are further defined by statute. "Merchandise," for purposes of the MMPA, is defined as "any objects, wares, goods, commodities, intangibles, real estate or services." Section 407.010(4). An unlawful practice, as contemplated in this section, is defined as:

> The act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce or the solicitation of any funds for any charitable purposes, as

defined in section 407.453, in or from the state of Missouri, is declared to be an unlawful practice.

Section 407.020.1. The term "purchase," for purposes of the MMPA, is not statutorily defined. "Purchase" is defined in Webster's dictionary as meaning "to obtain by paying money or its equivalent." *Jackson v. Charlie's Chevrolet, Inc.*, 664 S.W.2d 675, 677 (Mo.App. E.D.1984)(quoting Webster's Third New International Dictionary, Unabridged, 1981); *see also, Freeman Health System v. Wass*, 124 S.W.3d 504, 507 (Mo.App. S.D.2004).

We shall now consider the allegations of the plaintiffs' petition. In general terms, the plaintiffs alleged that they had purchased merchandise from the defendants for personal purposes, and had suffered an ascertainable loss of money and property as a result of the defendants' unlawful acts and practices. In particular, the plaintiffs pleaded that the defendants rendered a gambling entertainment "service," a form of "merchandise" under the MMPA, by providing video-poker and other machines for legalized personal gambling at the Ameristar Casino. They further averred that the defendants offered to grant or sell an "intangible" license and right—namely an opportunity to enter the casino and legally gamble—within the meaning and scope of the term "merchandise," as used in the MMPA. The plaintiffs maintained they "purchased" the defendants offered "service" and "intangible" right to gamble for "personal purposes," within the meaning and scope of the MMPA, by inserting "cash" (in the form of tokens) into the video-poker and slot machines at the casino.

The plaintiffs alleged a number of "unlawful practices" on the part of the defendants. With regard to their MMPA claim based on the defendants' changes in the point-award formulas, the plaintiffs alleged

that the defendants' representation regarding the changes, and the defendants' failure to timely and adequately disclose its falsity, were an "unlawful practice" within the meaning and scope of the MMPA. In particular, the plaintiffs pleaded that the defendants' representation was an "unlawful practice" because it was (a) a false promise; (b) fraudulent; (c) a misrepresentation of fact; (d) a misrepresentation of the defendants' present state of mind; (e) deceptive; and (f) an unfair practice. The plaintiffs further contended that the representation constituted the "act, use or employment of deception, fraud, . . . misrepresentation and unfair practices" by the defendants "in connection with the sale or advertisement of merchandise" within the meaning and scope of the MMPA. And, the plaintiffs averred, the representation, and the defendants' failure to fairly disclose its falsity, constituted a "concealment, suppression, or omission of a material fact" by the defendants "in connection with the sale or advertisement of merchandise."

The plaintiffs made similar allegations of "unlawful practices" with regard to their MMPA claim based on the defendants' food-comp program. In general, the plaintiffs alleged that the defendants' new food-comp program, the defendants' representations related thereto, and the defendants' failure to fairly disclose the falsity of the program and representations constituted an "unlawful practice" by the defendants within the meaning and scope of the MMPA. In particular, the plaintiffs pleaded that the new food-comp program, and the related representation was an "unlawful practice" because it was (a) a false promise; (b) fraudulent; (c) a misrepresentation of fact; (d) a misrepresentation of the defendants' present state of mind; (e) deceptive; and (f) an unfair practice. The plaintiffs further contended that the new system and representation constituted

the "act, use or employment of deception, fraud, . . . misrepresentation and unfair practices" by the defendants "in connection with the sale or advertisement of merchandise" under the MMPA. And, the plaintiffs averred, the new system and related representation, along with the defendants' failure to timely and adequately disclose its falsity, constituted "concealment, suppression, or omission of a material fact" by the defendants "in connection with the sale or advertisement of merchandise" within the meaning and scope of the MMPA.

Lastly, the plaintiffs alleged they suffered an ascertainable loss of money and property—namely the dollar value of "lost" cash-back comps, Star Awards club card status and the benefits associated therewith, and "banked" food comps—as a result of the defendants' unlawful acts and practices.

The trial court dismissed the plaintiffs' claims on a finding that licensed gaming or gambling does not constitute a "sale" or "purchase" of "merchandise" or advertisement of merchandise as defined in Section 407.010(4) and used in Sections 407.020.1 and 407.025.1. In support of its finding, the trial court cited this Court's decision in *Ziglin v. Players MH, L.P.*, 36 S.W.3d 786 (Mo.App. E.D.2001), wherein we upheld the grant of summary against a casino patron on his MMPA claim. The trial court erred in relying on *Ziglin*. The *Ziglin* case is factually and legally distinct from our circumstances. In *Ziglin*, a casino patron attempted to place a bet at a casino black-jack table; the casino refused to take the bet. We were not then required to reach, and did not reach, the issue of whether placing a bet constitutes a "purchase" within the meaning of the MMPA. Rather, our decision rested upon the fact that the patron's bet was not accepted by the casino on the occasion in

question; thus, we found patron's attempt to place a bet was insufficient to state a cause of action under the MMPA. The *Ziglin* case followed a line of cases wherein the courts have found that an unsuccessful attempt to purchase provides no basis for a cause of action under the MMPA. *See, e.g., Walsh v. Al West Chrysler, Inc.,* 211 S.W.3d 673 (Mo.App. S.D.2007); *Jackson v. Charlie's Chevrolet, Inc.,* 664 S.W.2d 675, 677 (Mo.App. E.D.1984)(noting that "[o]ne who attempts to purchase, but who never receives the goods or services nor pays anything of value cannot be said to have suffered damage by reason of any unlawful practice."). The circumstances alleged here are clearly different; here we are not dealing with an unsuccessful attempt to place a bet; the plaintiffs' bets were placed and accepted.

The defendants contend that the plaintiffs failed to state a cause of action, and that the petition should be dismissed, because the plaintiffs did not purchase any merchandise nor suffer an ascertainable loss. The defendants also contend that there can be no actionable false representation or promise because they expressly reserved their right to terminate or make changes to the program at any time. As discussed above, the membership card and the terms contained thereon were outside of the pleadings, and the trial court erred in considering the card and its terms. Nor may we consider the card and its terms, given the current posture of the case before this Court.

The defendants boldly theorize that the MMPA does not even apply to gambling. They argue that a casino player who drops a coin in a slot machine receives no reciprocal promise that he will obtain any "merchandise" in return because the player knows that he may win nothing. The defendants even cite to various definitions of "gamble" to buttress this remarkable argument. They posit that these various definitions all acknowledge the element of chance or risk. The defendants define "gamble" as "(a) to bet on an uncertain outcome; (b) to play a game of chance; (c) to take a risk in the hope of gaining advantage; and (d) to engage in reckless behavior." [2] The defendants maintain that the plaintiffs entered the casino gaming floor to "bet," "play," and "take risks," not to purchase merchandise. The defendants apparently believe that the placing of a bet is no different than pitching a coin in a fountain or throwing money down a sewer, actions that are taken with no reasonable expectation of a return. We entirely reject this argument.

Certainly, the casino player who drops a coin in a slot machine may lose his bet. But this does not mean the casino player is precluded from seeking relief under the MMPA. Contrary to the Casino's argument, we conclude that the casino player who drops a coin into a slot machine is not engaging in a purposeless act, but rather is indeed purchasing merchandise, as that term is defined in the MMPA. We turn to definitions set out in this state's criminal gambling statutes for assistance. As therein stated, a person engages in "gambling" "when he stakes or risks something of value upon the outcome of a contest of chance or a future contingent event not under his control or influence, upon an agreement or understanding that he will receive something of value in the event of a certain outcome." Section 572.010(4). "Something of value" is further defined as "any money or property, any token, object or article exchangeable for money or property, or any form of credit or promise

**2.** The defendants cite to the American Heritage Dictionary of the English Language, Fourth Edition (2004) in support of their definition of "gamble."

directly or indirectly contemplating transfer of money or property or of any interest therein or involving extension of a service, entertainment or a privilege or playing at a game or scheme without charge." Section 572.010(12). These statutory definitions comport with the definition of "wager," set forth in Black's Law Dictionary, which reads: "a contract by which two or more parties agree that a certain sum of money or other thing shall be paid or delivered to one of them or that they shall gain or lose on the happening of an uncertain event or upon the ascertainment of a fact in dispute, where the parties have no interest in the event except that arising from the possibility of such gain or loss." Black's Law Dictionary 1579 (6th ed.1990); *see also,* Black's Law Dictionary 321 (7th ed.1999). We hold that the casino player who drops a token in a slot machine or, as here, a video-poker machine, is "purchasing" "merchandise" within the meaning and scope of the MMPA, even though there is no guarantee of return. The casino player, by dropping a token into the machine, is purchasing the intangible chance of winning or, in other words, the intangible right to a product upon the happening of certain conditions.

If we accepted the defendants' argument, a customer who was cheated by a casino that misrepresented the rules of a game or the odds of winning a bet would have no remedy under the MMPA. We believe a customer placing a bet is owed a duty of fair play. A gambler who places a bet has entered into a wagering contract. *See, Id.* He has a right to expect the casino will honor the wagering contract. And in Missouri, every contract includes an implied covenant of good faith and fair dealing. *Farmers' Electric Cooperative, Inc. v. Missouri Department of Corrections,* 977 S.W.2d 266, 271 (Mo. banc 1998). Although the customer may win nothing in placing a bet, he nonetheless has a right to an honest chance of winning.

The MMPA is designed "to preserve fundamental honesty, fair play and right dealings in public transactions." *Ullrich v. CADCO, Inc.,* 244 S.W.3d 772, 777 (Mo. App. E.D.2008)(quoting *Schuchmann v. Air Services Heating & Air Conditioning, Inc.,* 199 S.W.3d 228, 233 (Mo.App. S.D. 2006)). The statute paints in "broad strokes to prevent evasion thereof due to overly meticulous definitions." *Id.* at 778. In light of these underlying principles, and our standard of review, we hold that the plaintiffs have set forth sufficient facts establishing the elements of a MMPA cause of action. The trial court erred in dismissing the plaintiffs' claims. We grant this point.

### Breach–of–Contract Claims

We next address the plaintiffs' allegation that the trial court erred in dismissing their two breach-of-contract claims. Again, the trial court dismissed the claims, reasoning that the plaintiffs' claims rested upon their status as card-holders and that the terms of comps were not contracts and not binding on the defendants because the comps were limited by the terms on the cards.

 The trial court's dismissal is predicated on its consideration of the terms printed on the cards. As we discussed, the trial court erred in considering matters outside the pleadings. Accepting the allegations as true, and applying a very tolerant and liberal construction to the allegations, as we must, we hold that the plaintiffs' petition sufficiently alleges each required element to state a cause of action for breach of contract. In the first of their breach-of-contract counts, the plaintiffs pleaded an offer by the defendants, to give video-poker players the same cash-back comps, despite the change in how they determined points; acceptance of the de-

fendants' offer and performance by the plaintiffs, by gambling at the casino; breach of the contract by the defendants; and damages resulting from the breach. In their second breach-of-contract count, the plaintiffs pleaded an offer by the defendants to save and accumulate, rather than purge, the plaintiffs' earned food comps under their new food-comp program; acceptance of the defendants' offer and performance by the plaintiffs, by gambling at the casino, and "banking" food comps rather than redeeming all earned food comps; breach of the contract by the defendants; and damages resulting from the breach. Such are the elements of an action for breach of contract. *See Venable v. Hickerson, Phelps, Kirtley & Associates, Inc.,* 903 S.W.2d 659, 664 (Mo.App. W.D.1995)(noting elements required to state a cause of action for breach of contract); *see also, Olathe Millwork Company v. Dulin,* 189 S.W.3d 199, 203 (Mo.App. W.D.2006)(noting essential elements of a contract). Of course, the ultimate success of all the plaintiffs' claims rests upon the proof, the findings of the fact trier, and any affirmative defenses that may hereafter be pleaded by the defendants but which are now of no concern to us. *See Collins v. Swope,* 605 S.W.2d 538, 540 (Mo. App. S.D.1980). We simply hold that under our standard of review, the petition on its face sets forth sufficient facts establishing the elements of a breach-of-contract cause of action, and that the court erred in dismissing the plaintiffs' claims. We grant this point.

### Missouri Gaming Commission

■ Before addressing the plaintiffs' final point on appeal, we pause to address a challenge to the trial court's jurisdiction. The defendants contend that, in the event we conclude the petition states a claim, the court should nevertheless dismiss the petition and defer the issues raised by the plaintiffs' petition to the Missouri Gaming Commission under the doctrine of primary jurisdiction. The defendants argue that the plaintiffs' cause of action falls under the Commission's jurisdiction because the Commission has promulgated specific regulations controlling the advertisement and promotional activities of casinos. We are not persuaded.

■ The plaintiffs should not be deprived of their statutory and common-law remedies merely because the defendants' activities are regulated. There are many regulatory bodies in this state. The establishment of the Board of Healing Arts does not deprive an injured patient of his medical-malpractice claim. Likewise, the establishment of the Gaming Commission does not deprive a casino customer of statutory and common-law remedies. We conclude that strict regulation exists due to the checkered history of legalized gambling, not to deprive casino customers of their legal remedies. The defendants effectively argue that the plaintiffs' statutory and common-law remedies are repealed by implication. Repeals of statutory provisions by implication, however, are disfavored. *See StopAquila.org v. City of Peculiar,* 208 S.W.3d 895, 905 n. 14 (Mo. banc 2006). Furthermore, "where the legislature intends to preempt a common law claim, it must do so clearly." *Overcast v. Billings Mutual Insurance Company,* 11 S.W.3d 62, 69 (Mo. banc 2000). "[U]nless a statute clearly abrogates the common law either expressly or by necessary implication, the common law rule remains valid." *In re Estate of Parker,* 25 S.W.3d 611, 614 (Mo.App. W.D.2000). Nothing in the statute creating the Gaming Commission expressly or implicitly abrogates the plaintiffs' common-law and statutory remedies.

■ Moreover, we fail to perceive how the doctrine of primary jurisdiction applies. Under the doctrine of primary jurisdiction, courts generally will not decide a controversy involving a question within the jurisdiction of an administrative tribunal until after the tribunal has rendered its decision. *Killian v. J & J Installers, Inc.*, 802 S.W.2d 158, 160 (Mo. banc 1991). This policy of restraint applies (a) where administrative knowledge and expertise are demanded to determine technical, intricate fact questions, and (b) where uniformity is important to the regulatory scheme. *Id.*; *MCI Metro Access Transmission Services, Inc. v. City of St. Louis*, 941 S.W.2d 634, 644 (Mo.App. E.D.1997). The instant case does not fall within these circumstances.

### Disqualification of Plaintiffs' Counsel

We turn now to the plaintiffs' final point on appeal challenging the trial court's disqualification of their attorney. In disqualifying legal counsel for the plaintiffs, the trial court found that counsel had a disqualifying conflict of interest in his status as both a class member and as attorney of record. The trial court also found that counsel was a "necessary witness" and thus was disqualified under Rule 4–3.7.[3]

■ The disqualification of an attorney is a matter that lies within the sound discretion of the trial court. *See* *State ex rel Burns v. Richards*, 248 S.W.3d 603 (Mo. banc 2008). We review the trial court's ruling for an abuse of that discretion. *Id.* After review of the record before us, we conclude that the trial court abused

its discretion in disqualifying plaintiffs' counsel at this point in the proceedings.

■ The trial court's first ruling disqualifying counsel for conflict of interest is predicated on counsel's alleged "class member" status. Yet at the time the defendants' motion to disqualify was filed, heard, and ruled upon, the plaintiffs had not sought class-action certification. At the time the trial court entered its disqualification order, the pleadings reflected seven individual plaintiffs suing the two defendants. The trial court's ruling, finding that counsel had a disqualifying conflict of interest based on his status as class member, was premature and constitutes an abuse of discretion.

■ The trial court also abused its discretion in its second ruling disqualifying counsel as a necessary witness. The defendants alleged that counsel should be disqualified as a necessary witness, pursuant to Rule 4–3.7, because he was an essential fact witness on key issues. The burden was on the defendants, as the moving parties, to prove their allegations and establish a disqualification ground. The defendants, however, failed to carry their burden, as they failed to show that counsel was the only person who could testify to such matters. *See, e.g., State v. Myers*, 997 S.W.2d 26 (Mo.App. S.D.1999); *State v. Werneke*, 958 S.W.2d 314 (Mo.App. W.D. 1997); *State v. Mason*, 862 S.W.2d 519 (Mo.App. E.D.1993). Indeed, at oral argument before this Court, the defendants acknowledged they did not allege that

---

**3.** Supreme Court Rules of Professional Conduct Rule 4–3.7 generally prohibits an attorney from simultaneously serving as advocate and witness at a trial. *State v. Mason*, 862 S.W.2d 519, 521 (Mo.App. E.D.1993). The rule reads, in relevant part:

(a) A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness unless:

(1) the testimony relates to an uncontested issue;
(2) the testimony relates to the nature and value of legal services rendered in the case; or
(3) disqualification of the lawyer would work substantial hardship on the client.

there was an absence of other fact witnesses. We grant this point and reverse the trial court's disqualification order.

### Conclusion

We reverse the trial court's rulings, and remand the cause to the trial court for further proceedings consistent with this opinion.

ROY L. RICHTER, P.J., and GEORGE W. DRAPER III, J., concur.